In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1992

DEMETRIUS ROSS, *et al.*,

*Plaintiffs-Appellees*,

*v.*

GREG GOSSETT, *et al.*,

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 15-cv-309-SMY-MAB — **Staci M. Yandle**, *Judge*.

———————————

ARGUED APRIL 1, 2021 — DECIDED MAY 5, 2022

———————————

Before MANION, ROVNER, and ST. EVE, *Circuit Judges*.

ROVNER, *Circuit Judge*. The plaintiffs in this case are all inmates who were housed by the Illinois Department of Corrections (the "IDOC") at the Illinois River, Big Muddy River, or Menard correctional centers during the period from April 2014 through July 2014. They alleged that the prison-wide shakedowns conducted by the defendants violated their constitutional and statutory rights. Their second amended complaint, which is the operative one here, was brought under

42 U.S.C. § 1983 on behalf of the plaintiffs and all other similarly situated inmates in those three correctional centers during that time who were subjected to the shakedowns of their prison cells by the tactical teams. Relevant to this appeal, they allege that the planning and execution of the shakedowns violated the Eighth Amendment because it was designed to inflict pain and humiliation, as well as alleging conspiracy and failure-to-intervene claims under the Eighth Amendment. The plaintiffs allege that tactical team leaders of the IDOC conducted institution-wide shakedowns of inmates' cells at those correctional centers pursuant to a common policy or practice implemented, overseen, and encouraged by Department supervisors.

The district court consolidated a number of cases into this case, and the plaintiffs sought class certification, seeking to certify a class of inmates incarcerated in 2014 at: Menard from April 4-16, Illinois River from April 21-29, Big Muddy from May 12-19, and Lawrence from July 7-11. They sought certification only for claims against a discrete subset of the hundreds of defendants in this case, encompassing only the 22 defendants who were involved in supervisory roles for the shakedowns. The district court granted the proposed class certification, and the appellants now challenge that decision on appeal.

We review a district court's class certification determination only for abuse of discretion. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022); *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). In determining whether the court abused its discretion, we consider whether the court misunderstood the applicable law or made clear errors of fact. *Id.*

I.

We begin, then, with the facts as set forth by the district court in its determination. See Dist. Ct. Order at 1–4. In 2014, the IDOC's Chief of Operations, Joseph Yurkovich, and Deputy Chief of Operations, Michael Atchison, decided to execute prison-wide shakedowns for purposes of sanitation and to discover and remove contraband. Toward that end, they formed tactical teams supervised by senior IDOC officials, including head administrators from each of the prisons. They discussed the plan with the Statewide Tactical Commander, David White, and the Southern Regional Commander, Timothy McAllister, who created operations orders outlining the shakedown schedule and staffing needs.

Prior to the shakedown at each prison, White and/or McAllister discussed the actual operation of the shakedown with the prison warden and tactical commanders, and conducted three separate briefings. First, they would discuss the plan with tactical team commanders, wardens, and assistant wardens, including specific details as to how duties would be performed, what inmates would wear, and how inmates would be handcuffed, as well as discussing how tactical team members would conduct themselves and handle inmates. Next, the tactical team commanders and the assistant commanders discussed the shakedown plan with the members of the tactical team. Finally, the entire group would come together and discuss the plan, including the wardens, and McAllister or White.

That coordinated execution extended to the uniforms for the tactical team, and the sequence of events for the shakedown. Tactical team officers wore uniforms which contained no identifying insignia or name badges, thus making

identification of individual team members difficult, and which consisted of an orange jumpsuit, vest, gloves and helmet with face shield. Based on that distinctive uniform, the tactical teams were colloquially referred to as "Orange Crush" by inmates.

The shakedown itself proceeded in a deliberate, preordained manner, from the entry of the officers into the cell units all the way to the return of the inmates to their cells. The plaintiffs and defendants both agree that the shakedowns occurred and were executed according to a uniform plan under their supervision. They diverge, however, in the description of that plan.

As the court recognized, the plaintiffs describe the following sequence of events in the shakedowns. First, tactical team officers would enter the living units in a cacophonous manner, yelling loudly and banging their batons on the bars and railings of the unit. The tactical officers would then instruct inmates to strip and remove their clothing, and would order a "reverse" strip search, in which inmates would be required to manipulate their genitals and buttocks and then to put their hands into their mouths—a strip search sequence which the plaintiffs describe as demeaning and unsanitary.

Inmates were then commanded to put on a shirt, pants, and shoes, but were not allowed to don underwear. They were handcuffed in a position that is particularly painful and uncomfortable, in which their hands were behind their backs with their thumbs up and palms facing out. They were then marched to a holding area in a "nuts to butts" fashion, in which the genitals of inmates would come into contact with the backside of the inmate in front of them. They maintain that the tactical team members routinely pushed and shoved

inmates to ensure that such physical contact occurred. The holding areas included dining halls, gyms and chapels, and they were forced to remain in that holding area, handcuffed, either seated with their heads down or standing facing a wall, for 1 to 4 hours while the cells were searched. They were then returned to their cells in the same physically intrusive manner.

## II.

Pursuant to Federal Rule of Civil Procedure 23(a), "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Moreover, as relevant here, the plaintiffs also sought to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The appellants do not take issue with the district court's recitation of the facts, but argue that the district court erred in determining that the requirements of commonality, typicality, and predominance, were met.

## A.

As both the district court and the appellants recognize, in order to satisfy commonality, the plaintiffs' claim must "depend on a common contention" and "[t]hat common

contention … must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The district court held that the plaintiffs satisfied that requirement because they alleged that the defendants acted pursuant to a common policy and implemented the same or similar procedures at each of the four institutions, and that the challenge was to the constitutionality of that common plan as enacted. Accordingly, the court held that the claims arise under the same constitutional requirements and require resolution of key common factual and legal questions, specifically: "whether Defendants developed and carried out a uniform policy and practice that had the effect of depriving the putative class members of their Eighth Amendment right to be free from cruel and unusual punishment; whether the shakedowns were executed in the manner Defendants contend or as Plaintiffs claim; whether Defendants engaged in a conspiracy to deprive the putative class members of their constitutional rights through the shakedowns; and whether the Defendants knew of, approved, facilitated and/or turned a blind eye to the alleged unconstitutional shakedowns." Dist. Ct. Order at 7. The court held that those questions would generate common answers, and that, "[i]n particular, the answer to whether Defendants developed and carried out a uniform policy and practice that had the effect of depriving the putative class members of their Eighth Amendment right to be free from cruel and unusual punishment does not require individualized consideration

and will resolve the liability aspect of this litigation and for each of the class claims." *Id*.

The appellants argue that *Wal-Mart* requires a different result. They contend that the plaintiffs may be able to establish commonality by showing the existence of an unconstitutional policy, but that under the reasoning in *Wal-Mart* the plaintiffs need to present "significant proof" of that policy, including its unconstitutional aspects, at the class certification stage. They assert that the plaintiffs failed to present significant proof that "the policy existed as plaintiffs claimed it did." The proof required by the appellants was not that a common policy and plan existed—they concede it did—but that the policy which existed was the one alleged by the plaintiffs with its unconstitutional provisions rather than the one alleged by them. The district court properly rejected that argument, recognizing that the analysis sought by the appellants is appropriate in an examination of the merits, but is not the proper focus in a class certification determination.

*Wal-Mart* itself is instructive as to that distinction. In that case, the plaintiffs, current and former female employees of Wal-Mart, alleged that the discretion exercised by their local supervisors over pay and promotion matters violated Title VII by discriminating against women. *Id*. at 342. In contrast to the present case, in *Wal-Mart* it was uncontested that there was no written or explicit corporate policy against the advancement of women. In fact, the existence of *any* uniform policy was itself contested. The Court described the basic theory of the plaintiffs' case as "that a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making

every woman at the company the victim of one common dis-
criminatory practice." *Id*. at 345. Accordingly, the Court held
that proof of commonality necessarily overlapped with the
merits as to the contention that Wal-Mart engaged in a pattern
or practice of discrimination, in that the answer to the crucial
question as to why each class member was disfavored was in-
capable of a common answer absent "some glue holding all
the alleged *reasons* for all those decisions together." *Id*. at 352.
(emphasis in original). That glue, the Court held, could be
provided by "significant proof" that Wal-Mart operated un-
der a general policy of discrimination. *Id*. at 353. Plaintiffs' ev-
idence, however, demonstrated only a corporate policy of al-
lowing discretion by local supervisors over employment mat-
ters. *Id*. at 355. The Court recognized that "[o]n its face, of
course, that is just the opposite of a uniform employment
practice that would provide the commonality needed for a
class action; it is a policy *against having* uniform employment
practices." *Id*. Therefore, the evidence by the plaintiffs was in-
sufficient to demonstrate commonality.

In contrast, the evidence that was lacking in *Wal-Mart*—
that the alleged discriminatory actions were undertaken pur-
suant to a uniform policy—is not only present in this case, it
is undisputed. The appellants concede that the shakedowns
were conducted according to a uniform plan created and im-
plemented by the appellants, and that the plan was executed
in a uniform manner under their supervision. There is no
need for the plaintiffs to provide "significant proof" of the ex-
istence of a uniform policy precisely because its existence is
conceded. The only dispute is the content of that uniform pol-
icy—specifically, whether that uniform policy reflected the
version alleged by the plaintiffs or the one alleged by the de-
fendants. That is a merits question, however. Either way, the

issue as to the constitutionality of the policy is capable of a common answer applicable to all of the defendants. If the policy is as the defendants allege and those provisions are constitutional, then the defendants will be entitled to a judgment in their favor. If the policy is as the plaintiffs allege and they can demonstrate that those uniform provisions are unconstitutional, then the plaintiffs will succeed. Either way, resolution of the question will provide a common answer as to the claims of the putative class that the shakedown policy created and implemented by the supervisors violated their constitutional rights. The district court therefore properly concluded that the appellants' arguments as to the content of the uniform policy were not relevant to the class certification context, but rather would be appropriate in a motion for summary judgment. The district court did not abuse its discretion in finding that the commonality requirement was met on these facts. And because the appellants' typicality argument here mirrored the arguments as to commonality, there is no abuse of discretion as to that holding either.

B.

That leaves the remaining challenge by the appellants, which is to the district court's determination that the predominance factor was met. One of the provisions of Rule 23(b) must be satisfied in order to maintain a class action, and the district court held that Rule 23(b)(3) had been met. See Fed. R. Civ. P. 23. That provision requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy." *Id.* at 23(b)(3).

The Rule 23(b)(3) standard "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013); see also *Gorss Motels*, 29 F.4th at 845 ("it is the method of determining the answer and not the answer itself that drives the predominance consideration"). As the district court recognized, the predominance requirement is met "when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." Dist. Ct. Order at 10; *Gorss Motels*, 29 F.4th at 844. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, classwide proof." *Gorss Motels*, 29 F.4th at 843–44; *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Citing numerous cases, the district court recognized that courts routinely have found that common questions predominate where the case claims the existence of a widespread or uniform practice. Dist. Ct. Order at 11. The court held that the issues as to liability are common and predominate in this case, and that any variation in the particular experiences of class members would primarily impact the type and amount of recoverable damages, and would not defeat predominance. *Id.* at 11–12, citing *Tyson Foods*, 577 U.S. at 453 ("[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be

considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members")(internal quotation marks omitted). The court also held that a class action was superior to other available methods for the fair and efficient adjudication of the controversy, under Rule 23(b)(3). Because of the number of putative class members and the common questions of law and fact that predominate as to those defendants, the court held that a class action would serve the economies of time, effort and expense and prevent inconsistent results. *Id*. at 12.

The appellants argue that the predominance requirement is not met because individual issues would dominate and would require thousands of mini-trials in order to determine which component of the policy each inmate was subjected to. They further assert that supervisor liability cannot be found unless the supervisor, with knowledge of the subordinate's conduct, approves the conduct, and therefore that supervisor liability claims are less appropriate for class-wide resolution. Both of these arguments, however, stem from the same misunderstanding of the issues presented in the claims of the putative class against these 22 defendants. The plaintiffs did not seek class status as to each and every defendant involved in the shakedown. The proposed class in this case relates only to the claims against the 22 supervisors responsible for the creation and implementation of the uniform shakedown plan, and the allegations are that the plan itself utilized measures designed to inflict pain or humiliation with no penological purpose, and therefore that the defendants violated the Eighth Amendment in their actions in imposing those conditions on the inmates. The defendants have maintained throughout this action that the shakedown plan was imposed in the same

manner at each institution, that safeguards were in place to ensure that everyone was aware of the plan, and that supervisors were present to ensure uniform execution of it. And the plaintiffs point to the consistent survey responses from 300 tact team members stating that they saw no member of the tact team deviate from the common plan that had been communicated to them. There is no dispute at this point in the litigation, then, that the shakedowns were conducted pursuant to a uniform plan.

In its memorandum in opposition to the motion for class certification in the district court, the appellants set forth the three constitutional claims common to each putative class member alleged by the plaintiffs as follows: "(1) Defendants designed and implemented procedures to be followed during all four shakedowns that were abusive and humiliating, rather than in furtherance of any proper penological purpose, in violation of the Plaintiffs' Eighth Amendment rights, (2) Defendants reached an agreement to deprive the class of their constitutional rights and to protect one another from liability for that deprivation, and (3) Defendants knew that the class's Eighth Amendment rights were about to be violated and failed to intervene to prevent the constitutional violation. Doc. 491 at 14. Nothing in those allegations requires mini-trials, let alone thousands of them.

The focus of each claim is on the requirements of the uniform plan that was used in the shakedowns, and the dispute at trial is between the two parties' different versions of the shakedown plan. We recognized in *Gorss* that similar claims of uniform behavior, such as those involving a uniform form or standardized agreement, are the type of claims that are amenable to class-wide proof and therefore capable of

satisfying the predominance inquiry. 29 F.4th at 844. Here, the mini-trials envisioned by the appellants relate to the conduct of individual officers with respect to individual inmates, but class status was not sought as to those defendants. The class action relates only to the supervisors, and the claims relate only to their actions with respect to the design and implementation of the allegedly-unconstitutional policy.

For that reason, the appellants' argument that supervisory liability cases are poorly suited to classwide resolution is similarly flawed. The appellants argue that supervisor liability is especially inappropriate where the evidence shows at worst that non-supervisory defendants departed from the policy set by the supervisors, because of the need for individualized evidence of the supervisor's knowledge and approval of the non-supervisor's actions. But that is the opposite of the allegations here. The class action against the supervisors here is decidedly not based on aberrant actions by rogue non-supervisors. It is premised entirely on the constitutionality of the procedures that were part of the plan designed and implemented by the supervisors, which allegedly were planned to cause pain or humiliation with no penological justification. Therefore, the argument as to the need for individual evidence for supervisor liability is inconsistent with the claims asserted here (and in any case was not itself raised in the district court.) The type of failure-to-intervene claims that would render supervisor liability dependent on individual facts are not present here, and the mere possibility of other legal theories or individual cases is insufficient to defeat predominance.

Even as to damages, the issue would be which of the unconstitutional actions the inmate experienced, but given the agreement that the shakedowns were carried out pursuant to

the same procedures, that issue is as likely to be resolved by a
determination of the uniform practice at the particular facility
that day, rather than one reliant on testimony from an indi-
vidual. Individual testimony would be necessary only as to
claims that individuals acted in a manner inconsistent with
the uniform policy and in an unconstitutional manner, but
those claims are not asserted as to these defendants and this
putative class. Even assuming a damages assessment would
require individual evidence, however, the court did not abuse
its discretion in determining that the common issues as to lia-
bility establish predominance. See *Tyson Foods*, 577 U.S. at
453–54 ("[w]hen one or more of the central issues in the action
are common to the class and can be said to predominate, the
action may be considered proper under Rule 23(b)(3) even
though other important matters will have to be tried sepa-
rately, such as damages or some affirmative defenses peculiar
to some individual class members") (internal quotation marks
omitted); *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008)
(holding that the need for individual damages determination
did not require denial of the motion for class certification).

Finally, with respect to predominance, the appellants ar-
gue that the district court failed to engage in the proper in-
quiry in that the court did not discuss the elements of the
claims and apply the inquiry to those elements. See *Santiago
v. City of Chicago*, 19 F.4th 1010 (7th Cir. 2021). But the district
court in fact addressed the only arguments they made in the
district court as to the elements of the claims. In the district
court, they argued that predominance requires an examina-
tion of the substantive elements of the claims, and that the dif-
fering testimony of the putative class members and the plain-
tiffs dissolved their claim as to the substance of the uniform
practice. They then argued that without that uniform practice

as alleged by the plaintiffs, the class members would have to prove individualized facts to demonstrate the elements of liability. They have repeated that argument to this court, and expanded it with examples, such as arguing that individual evidence would be required as to whether handcuffs were too tight for each individual inmate. That argument again assumes that the claims are based on the actions of individual officers; they are not. For instance, as to the handcuffing, the claim is that the plan unconstitutionally mandated the use of a particularly painful handcuff position that had no corresponding penological benefit. The evidence as to that claim would relate to what handcuffing method was mandated, and what the reasons were for its use. It is a common question not an individualized one. The appellants' argument once again is based on the notion that the plaintiffs had failed to establish that the uniform practice was as they alleged, and that any unconstitutionality would stem from actions of individuals.

As we have repeatedly emphasized, however, the class certification analysis is not an examination of the merits:

> "'a court weighing class certification must walk a balance between *evaluating* evidence to determine whether a common question exists and predominates, *without weighing* that evidence to determine whether the plaintiff class will ultimately prevail on the merits.' *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 377 (7th Cir. 2015) (emphases added). We recognize the contradiction built into the standard. The judge must examine the evidence for its cohesiveness while studiously ignoring its bearing on merits questions[.]"

*Gorss*, 29 F.4th at 845, quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). Here, the court drew the proper line. It addressed the challenge to the elements of the claims raised by the defendants, and recognized that all of the claims asserted in this case were claims based upon the responsibility of these defendants for the implementation of a uniform plan. The claims depend upon the ability of the plaintiffs to establish that the shakedowns were conducted pursuant to the uniform plan as they describe it and that those plans were themselves unconstitutional. The argument by the defendant that the plaintiffs cannot prove that the plan was as they alleged addresses their ability to succeed on the merits, not the propriety of class certification. The court properly limited the inquiry here to whether a common question exists and predominates, not whether the plaintiffs would prevail as to that common question. The court did not abuse its discretion in holding that the requirements of Rule 23 were met as to the class claims limited to this particular group of defendants.

Accordingly, the decision of the district court is AFFIRMED.