In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-1559

HEATHER SCHROEDER and MISTY TANNER,

*Plaintiffs-Appellees,*

*v.*

PROGRESSIVE PALOVERDE INSURANCE COMPANY
and PROGRESSIVE SOUTHEASTERN INSURANCE CO.,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00946 — **Jane Magnus-Stinson,** *Judge.*

———————————

ARGUED DECEMBER 5, 2024 — DECIDED JULY 24, 2025

———————————

Before SYKES, *Chief Judge,* and ROVNER and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Heather Schroeder seeks to represent a class of Indiana car owners insured by Progressive Paloverde Insurance Company and Progressive Southeastern Insurance Company (together, "Progressive") whose cars Progressive deemed total losses after collisions. Under its

standard-form Indiana auto insurance policy, Progressive agreed to pay these car owners the actual cash value of their cars, less a deductible. The policy specifies that "actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs."

To estimate a car's actual cash value from the list prices of comparable cars, Progressive adjusts list prices to account for typical negotiation between car buyers and sellers (it applies "Projected Sold Adjustments" to list prices). Schroeder argues that by applying these adjustments, Progressive breached its undisputed contractual duty to pay the putative class members the actual cash value of their totaled cars, as well as a disputed duty to calculate actual cash value payments using a particular method or formula. The district court recognized that whether Progressive paid each putative class member the actual cash value of her car is not susceptible to classwide proof, but it concluded that each putative class member could use common evidence to establish that Progressive employed an unacceptable method for calculating the actual cash value payments it offered insureds by applying Projected Sold Adjustments. The court certified a class on this basis.

We conclude, however, that Progressive's policy does not preclude Progressive from applying Projected Sold Adjustments in calculating actual cash value payments, so long as it ultimately pays its insureds the actual cash value of their totaled cars as defined under the policy and Indiana law. As the district court recognized, a jury would need to consider a host of individual questions to resolve whether Progressive failed to pay each putative class member this amount. Those individual questions overwhelm any common ones.

Because the district court's class certification decision rested on an erroneous interpretation of Progressive's Indiana auto insurance policy, we reverse and remand.

## I. Background

Progressive's standard-form Indiana auto insurance policy provides coverage for "sudden, direct and accidental loss to a" car "resulting from collision," up to the car's "actual cash value … at the time of the loss reduced by the applicable deductible." The policy specifies that "actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs." The policy also provides that Progressive "may use estimating, appraisal, or injury evaluation systems to assist [the company] in determining the amount of … loss payable under this policy," which "may be developed by … a third party and may include computer software, databases, and specialized technology." If Progressive and an insured cannot agree on the amount of the loss, either party "may demand an appraisal of the loss."

In practice, when an insured files a total-loss claim, Progressive uses a valuation system designed and built by Mitchell International, Inc. in conjunction with J.D. Power, called "WorkCenter Total Loss," to estimate the actual cash value of the totaled car at the time of the loss. Mitchell identifies list and sold prices of comparable cars from online marketplaces and dealer networks, applies adjustments to these prices, calculates the average adjusted price of selected comparable cars, then applies further adjustments based on characteristics specific to the totaled car to produce a valuation. Progressive takes this valuation and subtracts the applicable deductible to produce a settlement value for the insured's claim.

Central to this case are adjustments Mitchell's valuation system applies to the list prices of comparable cars: "Projected Sold Adjustments." These adjustments apply when only a list price is available for a comparable car and the car is not listed at a known "no haggle" dealer. To calculate these adjustments, J.D. Power takes a dataset containing both list and sold prices for a sample of cars, removes records it deems outliers, then estimates sold prices as a function of list prices for different make, model, year, and market area combinations.

Projected Sold Adjustments never project that a car will sell for more than its list price—and until mid-2021, they projected that every car would sell for less than its list price. This occurs because of the criteria J.D. Power uses to identify and remove outliers from its data. Based on assumptions about typical negotiations, J.D. Power classifies all records showing that a car sold for more than its list price as outliers. Until mid-2021, J.D. Power also classified all records showing that a car sold for its list price as outliers. In a deposition, a J.D. Power representative explained, "I think it would have just been assumed that it was either invalid data to get the match or an invalid negotiation—or an atypical negotiation between the dealer and consumer." Since mid-2021, however, J.D. Power no longer classifies all records with a sold price equal to the list price as outliers. J.D. Power has shifted to removing records from "no haggle" dealers (as noted above, Mitchell's valuation system does not apply Projected Sold Adjustments to the list prices of comparable cars from these dealers).

Heather Schroeder and Misty Tanner both purchased auto insurance policies from Progressive in Indiana. After car accidents in February 2019 and July 2020, respectively, they each filed insurance claims for resulting damage to their cars.

Progressive deemed their cars total losses, so Progressive used Mitchell's WorkCenter Total Loss System to estimate the value of each car. For Schroeder's 2018 Toyota Corolla, Mitchell's system used the sold prices of four comparable cars and the list prices of nine comparable cars to produce a valuation of $14,576 after adjustments. For Tanner's 2013 Chrysler 200, Mitchell's system used the sold prices of two comparable cars and the list prices of eight comparable cars to produce a valuation of $7,062 after adjustments. Taking the average Projected Sold Adjustment across all comparable cars in each report, these adjustments reduced the valuations of Schroeder's and Tanner's cars by $655 and $549, respectively.

Progressive offered to settle Schroeder's and Tanner's claims for the Mitchell valuations less a $500 deductible. Schroeder accepted Progressive's offer without dispute. Tanner, however, disputed her car's valuation. After reviewing her claim, Progressive re-estimated the value of Tanner's car using the WorkCenter Total Loss System but excluding the three comparable cars with the lowest adjusted prices. This increased Progressive's valuation of Tanner's car—and its settlement offer—by $500. Tanner accepted the new offer.

In May 2022, Schroeder filed this lawsuit, asserting that Progressive had breached a contractual duty and a duty of good faith by applying Projected Sold Adjustments within its process for estimating the actual cash value of her car. Tanner joined the suit as a named plaintiff in April 2023. Schroeder brings her claims individually and on behalf of a putative class, while Tanner brings only individual claims.

Schroeder then moved for class certification under Federal Rule of Civil Procedure 23(b)(3). The district court granted the motion, certifying a class of

All persons who made a first-party claim on a policy of insurance issued by Progressive Paloverde Insurance Company to an Indiana resident who, from the earliest allowable time through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a vehicle valuation report prepared by Mitchell and the [actual cash value] was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine [actual cash value].

*Schroeder v. Progressive Paloverde Ins. Co.*, 713 F. Supp. 3d 523, 541 (S.D. Ind. 2024).

Progressive petitioned for interlocutory review of the district court's class certification order pursuant to Federal Rule of Civil Procedure 23(f), and we granted the petition.

## II. Discussion

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To justify the exception, which "can cause a considerable tilt in the playing fields of litigation," Schroeder must demonstrate that a proposed class satisfies the requirements for certification. *Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ.*, 797 F.3d 426, 433 (7th Cir. 2015).

Federal Rule of Civil Procedure 23 sets forth these requirements. Rule 23(a) identifies four universal requirements for class certification: numerosity, typicality, commonality, and adequacy of representation. Rule 23(b) identifies additional

requirements specific to different types of class actions. When a plaintiff seeks class certification under Rule 23(b)(3), as here, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members," and "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Class certification is only proper if the district court "is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23] have been satisfied." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). We review a district court's decision to grant or deny class certification for an abuse of discretion, which can occur when the court commits a legal error. *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338 (7th Cir. 2023). Here, we conclude that the district court abused its discretion because it rested its analysis of commonality and predominance—and ultimately its class certification decision—on an erroneous legal conclusion about the duties contained in Progressive's standard-form Indiana auto insurance policy.

## A.

Rule 23(a)(2) requires class members' claims to "depend upon a common contention...." *Wal-Mart Stores*, 564 U.S. at 350. A question satisfies this commonality requirement if "the same evidence will suffice for each member to make a *prima facie* showing [on the question] or the issue is susceptible to generalized, class-wide proof," *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 844 (7th Cir. 2022) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)), and "determination of [the question's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart Stores*, 564 U.S. at 350.

"Predominance 'builds on commonality'" by requiring that common questions "predominate" over individual ones. *Eddlemon*, 65 F.4th at 338 (quoting *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 607 (7th Cir. 2021)). The predominance "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). It "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case," *Tyson Foods*, 577 U.S. at 453, and to "consider their relative importance," *Eddlemon*, 65 F.4th at 339 (quoting *Santiago v. City of Chi.*, 19 F.4th 1010, 1016 (7th Cir. 2021)). "This is because … 'the predominance requirement is [only] met when common questions represent a *significant* aspect of a case.'" *Id*. (alteration in original) (quoting *Ross v. Gossett*, 33 F.4th 433, 439 (7th Cir. 2022)).

A court must "circumscribe the claims and break them down into their constituent elements" to decide whether common questions represent a significant aspect of the case. *Id*. (citation modified); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."); *Speerly v. Gen. Motors, LLC*, --- F.4th --- , No. 23-1940, 2025 WL 1775640, at *5 (6th Cir. June 27, 2025) (en banc) (reasoning that a court can only assess commonality and predominance after "identifying the relevant elements of each cause of action"). We therefore begin our assessment of commonality and predominance with the elements of Schroeder's claims. *See Eddlemon*, 65 F.4th at 338–39.

Schroeder asserts claims against Progressive for a breach of contract and a breach of the duty of good faith. Under

Indiana law, which the parties agree applies, a plaintiff must prove a breach of a contract to prove either a breach-of-contract or a "garden-variety" bad-faith claim against an insurer.[*] *See Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007) ("To recover for a breach of contract, a plaintiff must prove that: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach."); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 891 (7th Cir. 2011) (explaining that under Indiana law, to prove a "garden-variety" bad-faith claim, a plaintiff must prove that the insurer breached a contractual duty to compensate her for a loss); *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind. 1993) ("[A]n insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty [of good faith].").

"[A] breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract." 23 Samuel Williston & Richard A. Lord, *Williston on Contracts* § 63:1 (4th ed. May 2025 update) (footnote omitted); *see also* Restatement (Second) of Contracts § 235(2) (Am. L. Inst. 1981) ("When performance of a duty under a contract is due any non-performance is a breach[.]"). The evidence required to prove the breach element of a breach-of-contract claim—as well as resulting damages, or the injury element— depends on the duty or promise at issue.

There is no dispute that Progressive's standard-form Indiana auto insurance policy is a valid contract and that its terms

---

[*] The parties agree that the breach-of-contract and bad-faith claims in this case will turn on the same arguments and evidence, and their arguments focus on the breach-of-contract claim.

govern Progressive's contractual relationship with each putative class member. The parties disagree, however, about the relevant duties contained in the insurance policy. Progressive asserts that its sole contractual duty is to pay insureds the actual cash value of their cars after a total loss. Schroeder, however, sees a second duty in Progressive's policy: a duty to "determine [actual cash value] based on market value."

If the relevant duty is a duty to pay insureds the actual cash value of their totaled cars, each class member must show that Progressive underpaid her to prove the breach element of her breach-of-contract claim. *See Kartman*, 634 F.3d at 890. Damages follow from underpayment, so a class member who proves the breach element of her claim simultaneously proves that she suffered damages resulting from the breach.

If the relevant duty is a methodological duty, each class member must show that Progressive used an invalid method to calculate actual cash value—independent from the result of the calculation—to prove a breach. *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) (distinguishing a duty "to calculate [an actual cash value] payment in accordance with [a] prescribed formula" from a duty "to arrive at a 'reasonable' estimate of" actual cash value). Where plaintiffs claim that an insurer breached a methodological duty by applying an invalid adjustment, as Schroeder does here, courts have reached different conclusions about the evidence required to prove resulting damages. *Compare Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022) (reasoning that "if a putative class member was given [the actual cash value of his or her car] or more, then he or she" cannot prove damages resulting from an invalid condition adjustment), *with Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 711–12

(5th Cir. 2020) (reasoning that "[t]he calculation of damages relating to [a] claim [that an insurer breached homeowners' insurance policies by deprecating labor costs in calculating actual cash value payments owed under the policies] is properly constrained to the amount of labor depreciation"); *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 461–62 (6th Cir. 2020) (same); *Stuart*, 910 F.3d at 373–77 (same).

In this case, the district court never defined the relevant duty under the policy, but the court rested its certification decision on a conclusion that the policy contains a methodological duty. In its predominance analysis, the district court expressed doubts about whether common evidence could resolve "whether Progressive paid [actual cash value] to putative class members." *Schroeder*, 713 F. Supp. 3d at 540. The district court contrasted this question with the question of "whether Progressive's use of [Projected Sold Adjustments] to determine [actual cash value] violated the Policy," which the district court deemed a common question that predominates over individual ones. *Id*. at 536, 540.

Under Indiana law, the meaning of an insurance policy is "primarily a question of law," and in general the same rules of interpretation apply to insurance policies as to other contracts. *Ebert v. Illinois Cas. Co.*, 188 N.E.3d 858, 863–64 (Ind. 2022). We therefore resolve the parties' dispute about the duties contained in Progressive's standard-form auto insurance policy without deference to the district court. *See Atl. Cas. Ins. Co. v. Garcia*, 878 F.3d 566, 569 (7th Cir. 2017) (reviewing a district court's interpretation of an insurance policy under Indiana law de novo); *Ohio Cas. Ins. Co. v. Ramsey*, 439 N.E.2d 1162, 1165–69 (Ind. Ct. App. 1982) (defining the term "actual cash value" in an insurance policy as a matter of law).

We consider whether common questions predominate over individual ones under the theory that Progressive breached its duty to pay its insureds the actual cash value of their totaled cars, which requires us to define the term "actual cash value" in the policy. Then, we consider the alternative theory that Progressive, by applying Projected Sold Adjustments, violated an independent duty to calculate actual cash value using a particular method or formula.

**B.**

"The essence of an insurance policy is a promise by the insurer to compensate the insured for the loss of something of value that is covered under the policy, thereby shifting the risk of loss from the insured to the insurer." *Kartman*, 634 F.3d at 890. Indeed, the terms of Progressive's standard-form auto insurance policy contain a promise by Progressive to pay for damage up to the "actual cash value" of the car "at the time of the loss reduced by the applicable deductible."

On appeal, Schroeder asserts that whether "list prices equate to market value" is a common question that predominates over individual ones, regardless of her theory of breach. We agree that whether cars sell for their list prices is amenable to proof by the common evidence she identifies: empirical data on car prices, and expert testimony about the used car market and the validity of J.D. Power's method for calculating Projected Sold Adjustments. To evaluate the next piece of her argument—that the truth or falsity of this question will resolve whether Progressive violated its duty to pay each putative class member the actual cash value of her totaled car, such that this question is also central and significant—we first define the term "actual cash value" in the policy.

Progressive's policy specifies that "actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs." The policy does not define "market value," so we apply the definition of "fair market value" recognized by Indiana law: "the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale." *Ramsey*, 439 N.E.2d at 1167 (collecting cases). We conclude that Progressive had a duty under the policy to compensate each insured after a total loss for the price at which her car would change hands between a willing buyer and seller at the time of the loss (accounting for the car's age and condition, among other factors), less the applicable deductible.

The truth or falsity of whether cars sell for their list prices will not resolve whether Progressive breached this duty by applying Projected Sold Adjustments. Even if a jury found that cars always sell for their list prices, this finding would not establish that Progressive underpaid each putative class member. It would remain possible that the comparable cars in a given valuation report for a putative class member's totaled car were more valuable than the totaled car in ways that Progressive's other adjustments did not capture, offsetting any negative effect from applying Progressive Sold Adjustments. *Cf. Drummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149, 158 (3d Cir. 2025) (reasoning that other adjustments Progressive applied in its process for estimating actual cash value payments owed to insureds under its standard-form Pennsylvania auto insurance policy could offset Projected Sold Adjustments). To evaluate such an argument, which Progressive has asserted that it intends to make as part of its defense in this case, the jury would need to consider individualized

evidence about each putative class member's car and each comparable car included in her car's valuation report.

As the district court recognized, the putative class members' cars differ by model, age, mileage, and other features. *See Schroeder*, 713 F. Supp. 3d at 540. To value a totaled car, Progressive (through its use of Mitchell's system) selects comparable cars that match the totaled car's features, so the comparable cars in Progressive's valuation reports also differ. Individual issues would thus overwhelm the litigation.

Alternatively, if a jury rejects the proposition that cars always sell for their list prices but finds that Projected Sold Adjustments are statistically biased measures of the difference between list and sold prices, this would introduce more complications. J.D. Power calculates a Projected Sold Adjustment for each make, model, year, and market area combination. Because each Projected Sold Adjustment has different inputs, the amount of distortion in each one would depend on how many records J.D. Power removed from the data it used to calculate the adjustment. In this scenario, then, the jury would not only need to consider individualized evidence about each putative class member's car and the comparable cars included in her car's valuation report but also individualized evidence about how J.D. Power derived each Projected Sold Adjustment included in her car's valuation report.

Accordingly, under the theory that Progressive breached a duty under its standard-form Indiana auto insurance policy to pay each putative class member the actual cash value of her totaled car, common evidence that "list prices equate to market value" will not resolve whether Progressive breached the policy. Rather, a jury would need to consider a host of individualized questions to resolve the breach issue. This means

that whether list prices equate to market value will not represent a significant aspect of this case. Even if this question resolves a central issue short of the breach issue, such that it qualifies as a common question under Rule 23(a)(2), this question will not predominate over individual ones, as required to satisfy Rule 23(b)(3)'s predominance requirement.

In so holding, we follow the reasoning of the Third and Eighth Circuits in similar cases to this one: *Drummond* and *In re State Farm Fire & Casualty Co.* ("*LaBrier*"), 872 F.3d 567 (8th Cir. 2017). In *Drummond*, the Third Circuit concluded that whether Progressive had breached its duty under its standard-form Pennsylvania auto insurance policy to pay insureds the actual cash value of their totaled cars by applying Projected Sold Adjustments would turn on individualized evidence, which would overwhelm the case. 142 F.4th at 159–61. Likewise, in *LaBrier*, the Eight Circuit reasoned that whether an insurer had paid insureds the actual cash value of damage to their homes, meaning "the difference in the fair market value of the damaged property immediately before and after the loss," could "only be determined based on all the facts surrounding a particular insured's partial loss." 874 F.3d at 574, 577. The *LaBrier* court thus concluded that common questions did not predominate over individual ones where a putative class of insureds had brought breach-of-contract claims challenging an insurer's decision to depreciate labor costs in calculating actual cash value payments. *Id*. at 576–77.

To the extent the Ninth Circuit has adopted a different view of the evidence required for an insured to prove the actual cash value of her property, we find *Drummond* and *LaBrier* more persuasive. *Compare Jama v. State Farm Mut. Auto. Ins. Co.*, 113 F.4th 924, 933 (9th Cir. 2024), *cert. denied sub nom.*

*State Farm Auto Ins. v. Jama*, No. 24-933, 2025 WL 1678989 (U.S. June 16, 2025) (reasoning that putative class members who challenged one discount applied by an insurer in calculating actual cash value payments could measure the actual cash value of their cars on a class-wide basis "by adding back to the value of their vehicles as calculated in the [insurer's valuation] reports the amount of the [challenged] discount"), *with Lara*, 25 F.4th at 1139 (reasoning that whether each putative class member received the actual cash value of her car "would involve looking into the actual pre-accident value of the car and then comparing that with what each person was offered," which is "an inquiry specific to that person").

## C.

We turn, at last, to the district court's related holdings that (1) the policy contains a duty to calculate actual cash value payments using a particular method or formula; and (2) the question, whether Progressive's use of Projected Sold Adjustments to calculate actual cash value violated this duty, is common and predominates over individual ones.

In several out-of-circuit cases, courts have assumed or held that an insurance policy contains a promise by an insurer to calculate covered losses in accordance with a prescribed method or formula—independent of a promise by the insurer to pay for covered losses. The courts in some of these cases have located this methodological duty in state insurance regulations incorporated into the policy. *See Jama*, 113 F.4th at 933 (assuming that an insurance policy contained a duty not to apply a discount for typical negotiation, where the insurer did not appeal the district court's holding that Washington insurance regulations forbid these discounts); *Lara*, 25 F.4th at 1139 & n.4 (assuming that proof of an insurer's failure to itemize a

condition adjustment, in violation of Washington insurance regulations, sufficed to establish the breach element of the plaintiffs' breach-of-contract claims); *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 417, 421–22 (5th Cir. 2023) (assuming that an insurer breached an insurance policy by failing to determine "actual cash value" using one of three acceptable methods under Louisiana insurance regulations).

In other cases, courts have defined the term "actual cash value" using a formula, then held that the insurer had a contractual duty to calculate actual cash value in accordance with this formula, independent of a contractual duty to pay insureds the actual cash value of losses. *Stuart*, 910 F.3d at 373–76 (holding that the insurer had a contractual duty to calculate the actual cash value of damage to its insureds' homes in accordance with the formula: replacement cost less materials depreciation); *Hicks*, 965 F.3d at 456, 459 (same implicitly, by accepting the viability of the plaintiffs' theory of breach); *Mitchell*, 954 F.3d at 705–07, 710 (same implicitly).

Schroeder analogizes to these cases, but they are inapposite to this case. As the source of a methodological duty, she relies solely on the policy language, "actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs." We have already interpreted this provision based on Indiana law to define actual cash value as the price at which a car would change hands between a willing buyer and seller at the time of the loss (accounting for the car's age and condition, among other factors). This definition does not consist of a formula. Given this interpretation and Schroeder's failure to identify any other policy provision or Indiana insurance regulation that prescribes a formula or method for calculating actual cash value, we conclude that the

policy does not preclude Progressive from applying Projected Sold Adjustments in calculating its settlement offers, so long as Progressive ultimately pays its insureds the actual cash value of their totaled cars as defined in the policy and by Indiana law. *Cf. LaBrier*, 872 F.3d at 573–74, 576 (after interpreting the term "actual cash value" in a Missouri homeowner's insurance policy to mean "the difference in the fair market value of the damaged property immediately before and after the loss," reasoning that the policy did not preclude the insurer from depreciating labor costs in its estimations of this amount); *Drummond*, 142 F.4th at 160 & n.5 (distinguishing *Jama* on the grounds that Pennsylvania insurance regulations do not forbid insurers from applying negotiation discounts in their calculations of actual cash value payments).

Our conclusion resolves as a matter of law the common question the district court identified. Progressive's use of Projected Sold Adjustments in calculating actual cash value payments "does not by itself establish liability for breach…." *Kartman*, 634 F.3d at 890. The district court premised its analysis of commonality and predominance on an erroneous legal conclusion that the putative class members could succeed on their claims under this theory of breach. We therefore REVERSE the district court's class certification order and REMAND for further proceedings consistent with this opinion.